AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
6/6/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CO___ DEPUTY

United States of America

v.

MICHAEL ELIJAH MCNEELY,

Defendant

FILED
CLERK, U.S. DISTRICT COURT
06/06/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

Case No.   2:22-mj-02226-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between the dates of October 7, 2021, and February 22, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business Dealing in Firearms without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Marlene Lopez
Complainant's signature

Marlene Lopez, ATF Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 6, 2022

[signature: Karen L. Stevenson]
Judge's signature

City and state:   Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
Printed name and title

AUSA: Lynda Lao (x7167)

**AFFIDAVIT**

I, Marlene Lopez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against **MICHAEL ELIJAH MCNEELY** ("**MCNEELY**") for a violation of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business Dealing in Firearms without a License.

2. This affidavit is also made in support of applications for warrants to search the person and property described in Attachments A-1, A-2, and A-3:

    a. The residence located at 3910 Dublin Avenue, Los Angeles, California 90008 (the "**SUBJECT PREMISES**"), as further described in Attachment A-1;

    b. A gold, Toyota Camry vehicle bearing California license plate 4RNJ884 (the "**SUBJECT VEHICLE**"), as further described in Attachment A-2; and

    c. The person of **MICHAEL ELIJAH MCNEELY**, as further described in Attachment A-3.

3. The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 922(a)(1)(A) (Engaging in the Business of Manufacturing and Dealing in Firearms without a License) (the "**Subject Offense**"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II.  INTRODUCTION

5. I am and have been a Police Officer with the Los Angeles Police Department ("LAPD") since November 2007. I am currently cross-designated as a Task Force Officer with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), assigned to work the Los Angeles Field Division, where I participate in investigations involving, prohibited persons possessing firearms, persons trafficking firearms, persons possessing illegal firearms and sales of controlled substances. During my time as a Task Force Officer, I have participated in multiple ATF operations with federal special agents and local police involving the investigation of violations of firearms and narcotics laws.

6. As an LAPD officer, I was assigned to the 77th Street Area as a patrol officer where I participated in dozens of investigations regarding violent crime, illegal narcotics, and illegal possession of firearms. As a patrol officer, I

interviewed criminal suspects, as well as victims and witnesses of crimes. I have also participated in investigations focusing on gang activity.

### III. SUMMARY OF PROBABLE CAUSE

7. Over the course of three controlled transactions, between October 2021 and February 2022, **MCNEELY** sold an undercover law enforcement agent ("UC") four unserialized, privately manufactured firearms ("PMFs" or "ghost guns"). Text message communications between the UC and **MCNEELY**, using the phone number 323-747-3852, began on or about September 2021 and continued for approximately five months. **MCNEELY** sent the UC pictures of PMFs along with prices prior to meeting the UC. **MCNEELY** is not licensed to manufacture or sell firearms. For each of the controlled transactions, law enforcement observed **MCNEELY** transporting the firearms he sold to the UC using the **SUBJECT VEHICLE**. On or about February 22, 2022, prior to meeting with the UC for another firearms transaction, **MCNEELY** was seen exiting from the front door of his residence, the **SUBJECT PREMISES**, by law enforcement officers. The **SUBJECT PREMISES** is documented on **MCNEELY**'s California Driver's License as his place of residence.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.     ATF learns of MCNEELY selling firearms**

9.  On or about July 1, 2021, ATF Special Agent Lozano was contacted by an ATF Confidential Informant ("CI")[1] regarding "Mike" (later identified as **MICHAEL ELIJAH MCNEELY**) selling narcotics and firearms.

10. On or about July 20, 2021, at the direction of SA Lozano, the CI informed **MCNEELY** that he/she would be putting him in contact with someone interested in purchasing firearms and narcotics. Text message communications between the UC and **MCNEELY**, using phone number 323-747-3852, began on or about September 2021 and continued until February 2022. During this time, **MCNEELY** sent the UC numerous pictures of firearms, and discussed prices and possible meeting times and places for **MCNEELY** to sell firearms to the UC.

11. From my presence at some of the transactions, my conversations with other law enforcement officers, and my review of reports and recordings from the transactions, I am aware of the following.

**B.     October 7, 2021: MCNEELY Sells Two Privately Manufactured Firearms to the ATF UC**

12. On or about September 29, 2021, **MCNEELY**, using phone number 323-747-3852, and the UC exchanged text messages in order to establish a date and time to meet. The UC sent **MCNEELY** the

---

[1] The CI has been actively cooperating with ATF since May 2018, and is cooperating in this investigation for monetary compensation. The CI's criminal history does not include any prior convictions, but does include arrests for fraud, non-sufficient funds, operating a vehicle while impaired, grand theft, receipt of stolen property, providing false information to a pawnbroker, burglary, theft by use of an access card, and zoning code violations.

following message: "U gonna be good for next week Thursday when im back in town." The UC received the following response from **MCNEELY**: "Yup", "U want them 2 still." On October 6, 2021, the UC received the following message from **MCNEELY**: "Where u tryna meet tmro". On or about October 7, 2021, the UC contacted **MCNEELY** confirming the firearm deal and received a text message from **MCNEELY** with a photograph of two firearms. The UC advised **MCNEELY** of his/her location: "Im at tge Chevron"…"Are we meeting up?" **MCNEELY** asked which Chevron and later responded with: "Aight im finna be there."

13. On or about October 7, 2021, **MCNEELY** sold two PMFs to an ATF undercover agent in exchange for $1,800. Both PMF's were handguns. On the first handgun, the slide contained markings indicating that it was a Glock 19, 9mm caliber handgun. On the second handgun, the slide indicated that it was a Glock 26, 9mm caliber handgun. **MCNEELY** arrived and departed the meet location, a gas station parking lot in Los Angeles, in the **SUBJECT VEHICLE**.

a. A review of California Department of Motor Vehicle records revealed that the **SUBJECT VEHICLE** is registered to C.N.M, at 3910 Dublin Ave, Los Angeles, CA 90008.

C. **November 2, 2021: MCNEELY Sells One Privately Manufactured Firearm to the ATF UC**

14. From October 27, 2021, to November 2, 2021, **MCNEELY** and the UC exchanged text messages regarding another firearms transaction. On or about October 28, 2021, the UC attempted to order more firearms (an assault rifle and two handguns) from

5

**MCNEELY**. **MCNEELY** replied: "Jus talked to my guy i cant get u that rn". The UC asked for the same firearms as those previously purchased during the October 7, 2021 controlled buy, and **MCNEELY** agreed to the deal. On or about November 1, 2021, the UC confirmed the meet with **MCNEELY**. **MCNEELY** advised in a text message: "Nah I couldn't get them", "If u still were comin this way i do have 1 ready for u but I should be able to get more soon". The UC agreed to purchase just the one firearm, and arranged with **MCNEELY** to meet on the following day.

15. On or about November 2, 2021, **MCNEELY** sold one PMF to the ATF undercover agent in exchange for $900. The PMF was a handgun, and the gun slide indicated that it was a Glock 26 9mm handgun. **MCNEELY** arrived and departed the meet location in **SUBJECT VEHICLE**.

    D.    **February 22, 2022: MCNEELY Sells One Privately Manufactured Firearm to the ATF UC**

16. On or about February 16, 2022, **MCNEELY** contacted the UC and offered to sell a pistol for $2,000. The UC received the following text message from **MCNEELY**: "My guy hit me he said he got a AR pistol rn if u want one", "Goin for 2000". **MCNEELY** agreed to hold the firearm for the UC. The UC and **MCNEELY** agreed to meet.

17. On or about February 22, 2022, LAPD Officer Brett Populorum and TFO Deanna Quesada observed the **SUBJECT VEHICLE** parked in front of 3910 Dublin Avenue, Los Angeles, California 90008, the **SUBJECT PREMISES**. **MCNEELY** was observed exiting from the front door of **SUBJECT PREMISES** holding a two-tone colored

6

backpack. **MCNEELY** placed the bag in the **SUBJECT VEHICLE** and drove away from the **SUBJECT PREMISES** in the **SUBJECT VEHICLE**.

    a. A review of California Department of Motor Vehicle records revealed that **MCNEELY** lists the **SUBJECT PREMISES** as his address.

18. **MCNEELY** arrived at the meet location in the **SUBJECT VEHICLE** where he sold one privately manufactured firearm to an undercover ATF agent in exchange for $2,000. After the meeting, **MCNEELY** departed the location in the **SUBJECT VEHICLE**, and TFO Quesada and LAPD Officer Populorum later observed **MCNEELY** return to the **SUBJECT PREMISES** in the **SUBJECT VEHICLE**.

    **E.**   **Firearms Licensing System (FLS) Check**

19. On or about September 21, 2021, Special Agent Lozano checked with Industry Operations Investigator ("IOI") James Palm regarding **MCNEELY's** license status. IOI Palm advised SA Lozano that **MCNEELY** showed a negative result in the Firearms Licensing System as a current, former or pending applicant/licensee to manufacture or sell firearms.

    **V.**   <u>**TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**</u>

20. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or vehicle, or in places that are readily accessible, and under

their physical control, such as in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

        b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        c.   Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these

photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

      d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

21. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **MCNEELY'**s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **MCNEELY'**s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

   24.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

25. For all of the reasons described above, there is probable cause to believe that **MCNEELY** has committed a violation of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms without a License. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person and property described in Attachments A-1, A-2, and A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  6th  day of
    June   , 2022.

*[signature]*

HON. KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

13